**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **YVONNE SWAIN,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO.  11-5531** |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**Goldberg, J.**                                             **February 20, 2015**

**<u>MEMORANDUM OPINION</u>**

Plaintiff, Yvonne Swain, a <u>pro se</u> litigant, has brought this civil rights action against Defendants, the City of Philadelphia, Philadelphia police officer Lieutenant George McClay (hereinafter collectively referred to as the "City Defendants"), and former Philadelphia police officer Kevin Booker.  Plaintiff asserts that, over the course of several years, she was the victim of ongoing domestic violence by Defendant Booker, and that Defendant McClay and other police officers concealed and assisted Booker in furthering this abuse by failing to take reports or investigate her complaints of abuse and violations of a Protection From Abuse ("PFA") order against Booker.  Plaintiff further claims that this conduct was part of a conspiracy between Defendants McClay and Booker to deprive her of her civil rights, and that this deprivation was caused by a custom maintained by the City of Philadelphia.  The City Defendants have filed a motion for summary judgment.[1]  For the reasons that follow, this motion will be granted.

---

[1] Defendant Booker is also a <u>pro se</u> litigant and has not filed a motion for summary judgment.

I.      **FACTUAL AND PROCEDURAL HISTORY**[2]

Plaintiff and Defendant Booker, a former Philadelphia police officer, were previously in a relationship and lived together from 1999 to 2007.  (Swain Dep. at 15.)  On July 31, 2007, the Court of Common Pleas of Philadelphia County issued a temporary PFA order prohibiting Defendant Booker from having any contact with Plaintiff.  (Attached to Pl.'s Resp. as Exh. 4.)  On August 3, 2007, after a hearing, a stay away order was entered by the court.  (Second Am. Compl. ¶ 13.)

Plaintiff contends that Defendant Booker violated the temporary PFA order on three occasions in August 2007.  Plaintiff filed multiple petitions for contempt, and a contempt hearing was scheduled for August 28, 2007.  Plaintiff alleges that Defendant Booker arrived at the hearing with Detectives Wayne Brown[3] and Joseph Crème who were there to testify as character witnesses on Defendant Booker's behalf.  On September 17, 2007, the court entered a final PFA order prohibiting Defendant Booker from having contact with Plaintiff for three years.  (Id. ¶¶ 20-21, 24-25.)

On August 8, 2007, Plaintiff was arrested by Detectives Wayne Brown and Crème for theft, burglary, receiving stolen property, criminal mischief and criminal trespass.  (Id. ¶ 13; Pl.'s Criminal Docket, attached to Pl.'s Resp. at Exh. 8)  These charges stemmed from allegations that Plaintiff had entered the residence of Defendant Booker without his permission.  (Swain Dep. at 20.)  Plaintiff was subsequently found guilty of theft, receiving stolen property, criminal trespass and criminal mischief, and was subsequently sentenced to a term of two years probation.  (Pl.'s Criminal Docket, attached to Pl.'s Resp. at Exh. 8.)

---

[2] All facts recited herein are undisputed unless otherwise noted.

[3] Detective Shaina Brown was also involved in the events which give rise to this litigation.  To avoid confusion, I will refer to each of the Detectives Brown by their first and last name.

On May 5, 2009, Plaintiff filed a complaint with Philadelphia Police alleging that Defendant Booker violated the PFA order by calling her sister and harassing her.  On May 10, 2009, Plaintiff filed a complaint alleging that she received a text message from Defendant Booker.  (Attached to Def.'s Br. at Exh. 5, 8.)

On May 11, 2009, Plaintiff alleges to have called the police to follow up on the complaints.  She spoke with Detective Wolkiewicz, who did not provide her with a status of the investigation.  On May 20, 2009, Plaintiff alleges to have gone to the police station in person and spoken with Defendant Lieutenant McClay about the complaints.  She contends that Defendant McClay was very rude to her and refused to take her complaint.  On June 5, 2009, Plaintiff alleges that she went to the police station and spoke to Officer Hetherington about the police "not following through with the investigations."  She contends that Officer Hetherington stated that "nothing would be done in the investigations" since Defendant Booker is related to Sid Booker, who "owns this police district."  (Second Am. Compl. ¶¶ 28-29, 32.)

Detective Shaina Brown was assigned to investigate both of Plaintiff's complaints.  On May 26, 2009, she interviewed Plaintiff's sister, and wrote in her investigation report that the sister "state[d] that there was no harassment and offender did not ask about [Plaintiff] . . . . [w]itness was unable to corroborate story."  With respect to the complaint that Plaintiff received a text message from Defendant Booker, Detective Shaina Brown secured a search warrant for Defendant Booker's cell phone.  Detective Shaina Brown completed the two investigations on June 8, 2009 and June 28, 2009, respectively. (Investigation Reports, attached to Def.'s Br. at Exh. 5, 8; Search Warrant, attached to Def.'s Br. at Exh. 9.)

On August 3, 2009, Defendant Booker was arrested for violating the PFA order.[4] (Attached to Def.'s Br. at Exh. 7.)  On September 9, 2009, Plaintiff filed a Citizen's Complaint with the Police Department alleging misconduct on the part of various police officers.[5]  Plaintiff alleged that Detective Wayne Brown came to court in August 2007 to improperly act as a character witness for Defendant Booker, that Defendant Lieutenant McClay refused to take her complaint in May 20, 2009, and that, on June 28, 2009, Officer Rollins gave her a "difficult time" in filing a police report.[6]  (Attached to Def.'s Br. at Exh. 4.)

On January 16, 2010, Plaintiff filed a complaint with the police department alleging that Defendant Booker violated the PFA order by driving by her house and telling her "that's why you're going to lose your job."  Detective James McDonnell initiated an investigation, which resulted in an arrest warrant being issued for Defendant Booker.  Defendant Booker was arrested on January 25, 2010.  On May 18, 2010, Defendant Booker was found guilty of violating the PFA order and sentenced to four months probation. (Attached to Def.'s Br. at Exh. 10-12; attached to Pl.'s Resp. at Exh. 23.)  On September 15, 2011, the PFA order against Defendant Booker was extended for a period of three years.  (Second Am. Compl. ¶ 47.)

In September 2011, Plaintiff initiated this lawsuit alleging that the City of Philadelphia, the Philadelphia Police Department, the Northwest Detectives Division, and the DA's Office violated her civil rights.  On November 14, 2011, Plaintiff filed an amended complaint against

---

[4] While Defendant Booker was convicted of violating the PFA order on May 18, 2010, it appears that the conviction was unconnected to the August 3, 2009 arrest.  The disposition of the charges related to the August 3, 2009 arrest is unclear from the record.

[5] Plaintiff, and the police officers against whom she made the complaint, were interviewed as part of the investigation.  On May 18, 2010, the Captain of the Northwest Detective Division completed the report which found no wrongdoing.  (Attached to Def.'s Br. at Exh. 2, 13.)

[6] While Plaintiff alleged misconduct on the part of various other police officers, these are the complaints that are germane to this litigation.

the City of Philadelphia, Detective Wayne Brown, Detective Crème, Lieutenant McClay and former Philadelphia police officer Kevin Booker alleging that these defendants violated her federal constitutional rights to equal protection and due process. All the defendants then filed a motion to dismiss. I dismissed Plaintiff's claims against Defendants Wayne Brown, Crème, and McClay as time-barred by the two-year statute of limitations. I also dismissed Plaintiff's timely allegations against Defendant Booker for not having adequately alleged that he was involved in state action. Plaintiff's <u>Monell</u> claim against the City was dismissed because Plaintiff did not identify any policy or custom that could give rise to municipal liability. Nevertheless, mindful that Plaintiff is a <u>pro</u> <u>se</u> litigant, I allowed her to amend her complaint and correct these deficiencies. <u>See</u> doc. no. 13.

On May 1, 2013, Plaintiff filed her second amended complaint against the City of Philadelphia, Lieutenant George McClay, and Kevin Booker alleging deprivation of her Fifth and Fourteenth Amendment rights to due process and equal protection under the law, and a civil conspiracy to deprive her of those rights. (Second Am. Compl. ¶¶ 78-92.) In addition to the incidents described above which occurred from 2007 to 2010, Plaintiff also sought redress for an incident involving Defendants McClay and Booker which she alleges occurred from May to July 2012.[7]

Plaintiff alleges that, on May 27, 2012, her neighbor told her that Defendant Booker went to the neighbor's house and told the neighbor "that if Plaintiff did not drop [this federal lawsuit] he would have [Plaintiff] locked up again and that he has the connections because of his friends on the force." Plaintiff called the police, made a complaint, and, on May 29, 2012, Plaintiff went to the police station to give a statement. On July 9, 2012, Plaintiff called to follow-up on her

---

[7] Plaintiff has not attached any documentation concerning the 2012 incident.

complaint, and spoke with Defendant McClay. Plaintiff contends that Defendant McClay refused to investigate her complaints. (Second Am. Compl. ¶¶ 53-59, 60-63, 67.)

On May 30, 2014, the City Defendants filed a motion for summary judgment. Plaintiff filed a response. This motion is now ripe for disposition.

## II.    STANDARD OF REVIEW

A party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact and that judgment is appropriate as a matter of law. FED. R. CIV. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment has been made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). An issue is "genuine" if a reasonable jury could rule in favor of the non-moving party based on the evidence presented. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). The non-moving party cannot avert summary judgment with speculation or conclusory allegations, but rather must cite to the record. Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); FED. R. CIV. P. 56(c). On a motion for summary judgment, the court considers the evidence in the light most favorable to the non-moving party. Anderson, 477 U.S. at 256.

## III.    ANALYSIS

Plaintiff brings a due process and equal protection claim under 42 U.S.C. § 1983 (hereinafter "§ 1983"), and a civil conspiracy claim under 42 U.S.C. § 1985 (hereinafter "§ 1985"). The City Defendants argue that, even accepting all evidence in the light most favorable to Plaintiff, she has not established that any of her constitutional rights have been violated. The City asserts that, even if a constitutional violation took place, summary judgment should be

granted because Plaintiff has not presented any evidence of a policy or custom that would establish <u>Monell</u> liability.  I will discuss Plaintiff's claims in turn.

### A.      Plaintiff's Claims Under the Fifth Amendment

Plaintiff claims that Defendants violated her rights to due process and equal protection under both the Fifth and Fourteenth Amendments to the Constitution.  The Fifth Amendment however "only applies to federal officials." <u>Bergdoll v. City of York</u>, 515 F. App'x 165, 170 (3d Cir. 2013) (citing <u>Nguyen v. U.S. Catholic Conference</u>, 719 F.2d 52, 54 (3d Cir. 1983)). Because there are no allegations of actions taken by federal officials, this claim fails as a matter of law.  <u>See</u> <u>id.</u> (dismissing a Fifth Amendment claim against various city and county officials for failing to allege wrongdoing on the part of federal actors).

### B.      Plaintiff's Claims Under the Fourteenth Amendment

### 1.      Alleged Violations of the Due Process Clause Under the State-Created Danger Doctrine

Plaintiff's Fourteenth Amendment due process claim is based on application of the state-created danger doctrine.  In <u>DeShaney v. Winnebago County Department of Social Services</u>, 489 U.S. 189 (1989), the United States Supreme Court held that a state does not have an affirmative obligation to protect its citizens' life, liberty and property from private invasion under the Due Process Clause.  However, when a state takes a person into custody, it assumes an affirmative duty to protect her from harm.  <u>Id.</u> at 199-200.  The principle derived from this statement has developed into what is known as the state-created danger doctrine.  A state-created danger exists "when state authority is affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source than he or she would have been in the absence of state intervention.'" <u>Bright v. Westmoreland Cnty.</u>, 443 F.3d 276, 281 (3d Cir. 2006) (quoting <u>Schieber v. City of Philadelphia</u>, 320 F.3d 409, 416 (3d Cir. 2003)).

7

There are four required elements to a state-created danger claim:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Id. at 281 (quotation marks omitted).

The City Defendants focus on the fourth prong of this standard and argue that Plaintiff, in her second amended complaint, has failed to identify any "affirmative exercise of authority under the state-created danger theory."  (Br. at 14.)   In response, Plaintiff cites to three actions to support her argument that her state-created danger claim should survive summary judgment:

(1) Directing the same Detective (Wayne Brown) who purportedly investigated plaintiff's complaint that defendant Booker violated the PFA Order to charge and arrest plaintiff with burglary charges (Swain Dep. At 82); (2) Philadelphia Detectives appearing at the criminal proceeding with defendant Booker as potential character witnesses on behalf of Booker and against plaintiff (Swain Dep. at 41-43); (3) when defendant McClay berated plaintiff and refused to accept her complaints that Booker violated the PFA Order.  (Swain Dep. at 49-51, 63-64).

(Resp. at 14.) [8]

---

[8] In my April 24, 2013 Order, I dismissed several of Plaintiff's allegations under the statute of limitations.  See doc. no. 13 (finding that all claims which accrued before September 2009 were time-barred given that § 1983 actions are subject to a two-year statute of limitations and Plaintiff filed her complaint in September 2011).  The first two actions, which occurred on August 8, 2008 and August 28, 2007, respectively, fall outside of the limitations period.  As for the third action, Plaintiff alleges malfeasance on the part of Defendant McClay on May 20, 2009 (outside of the limitations period) and July 2012 (within the limitations period).  I have considered all these claims on the merits here.

As to the first action, merely directing the same police officer (as opposed to two different police officers) to investigate two separate incidents involving the same individual is not an affirmative action which rendered Plaintiff more vulnerable to harm.  Plaintiff has made no allegations that her arrest by Detective Wayne Brown on the burglary charge was not supported by probable cause.  Indeed, "[a]n arrest 'based upon probable cause is justified, regardless of whether the individual arrested was guilty or not' . . . [and] cannot be considered a harm for purposes of [a state-created danger] claim."  <u>Berger v. Bucks County Com'rs Office</u>, 2010 WL 2635940, *2-3 (E.D.Pa. June 24, 2010) (Joyner, J.) (quoting <u>Dowling v. City of Pennsylvania</u>, 855 F.2d 136, 141 (3d Cir. 1988)).

The second action to which Plaintiff cites is a reference to Detective Wayne Brown and Detective Crème having accompanied Defendant Booker to a PFA contempt hearing on August 28, 2007.  At her deposition, Plaintiff stated that her lawyer at the time told her that "[t]hey came in the courtroom with Mr. Booker to testify as character witnesses."  However, as Plaintiff herself also stated, the contempt hearing was postponed, and the two detectives did <u>not</u> testify at that hearing or at any other hearing.  (Swain Dep. at 41-43.)  This does not constitute an affirmative action within the meaning of the state-created danger doctrine.

Third, Plaintiff contends that Defendant McClay's refusal to accept and investigate her complaints that Defendant Booker violated the PFA order constitutes an affirmative action which supports her state-created danger claim.  Plaintiff characterizes the affirmative conduct as the officials having "actively suppressed defendant Booker's acts as well [as having] assisted him in his defense against plaintiff's allegations of abuse."  (Resp.at 22.)  <u>Burella v. City of Philadelphia</u>, 501 F. 3d 134 (3d Cir. 2007), confronted the similar if not identical issue of whether the "refusal [on the part of Philadelphia police officers] to enforce the [PFA] order . . .

as well as overall inadequate intervention were affirmative acts which together increased the likelihood of harm." <u>Id.</u> at 147.  In <u>Burella</u>, the plaintiff had obtained at least three PFA orders against her husband but the police failed to arrest him when she reported that he had violated those orders by "shouting at and threatening her." <u>Id.</u> at 138.  Ultimately, the husband "went to the house he formerly shared with his wife and shot her in the chest." <u>Id.</u>

The United States Court of Appeals for the Third Circuit characterized the police department's failure to act on plaintiff's complaints that her husband had violated the PFA orders as "deeply troubling and unquestionably tragic." <u>Id.</u> at 147-48.  Nonetheless, the court concluded that that these failures "d[id] not give rise to a cognizable state-created danger claim." <u>Id.</u> at 148.  The court reasoned that "[Plaintiff's] attempt to characterize the officers' alleged wrongdoing as an affirmative misuse of authority is not persuasive.  Rather, it is apparent that what she actually contends is that the officers failed to act at all.  We agree with the officers that this argument is deficient as a matter of law." <u>Id.</u> at 147 (citing <u>Ye v. United States</u>, 484 F.3d 634, 638 (3d Cir. 2007) ("[B]oth <u>DeShaney</u> and [Third Circuit] precedents explicitly require[] an affirmative act rather than inaction."))

The <u>Burella</u> court relied on <u>Bright v. Westmoreland Cnty.</u>, 443 F.3d 276 (3d Cir. 2006), to buttress its conclusion that the failure to enforce a PFA order does not constitute an affirmative act within the meaning of the state-created danger doctrine.  In <u>Bright</u>, the police were informed by the father of an eight- and twelve-year old girl that the "man who was released on parole for an earlier sex offense involving [the] twelve-year-old . . . [had] repeatedly violated his parole by attempting to carry on a relationship with [her]." <u>Burella</u>, 501 F. 3d at 147 (citing <u>Bright</u>, 443 F.3d at 278-79).  Although the girls' father "was assured [by the police] that the perpetrator's parole would be revoked," the perpetrator murdered the eight-year-old "[b]efore the

parole revocation hearing had taken place." Id. (citing Bright, 443 F.3d at 278-79).  The father, suing on behalf of his deceased daughter, brought suit under the state-created danger doctrine and argued that "the police caused [his daughter's] death by [] delaying the revocation of parole."  Id. (citing Bright, 443 F.3d at 283).  The Third Circuit rejected this argument, stating that:

> The reality of the situation . . . is that what is alleged to have created a danger was the failure of the defendants to utilize their state authority, not their utilization of it.  [Plaintiff] has identified no action of the defendants that utilized their state authority in a manner that rendered [the deceased daughter] more vulnerable . . . than she would otherwise have been.

Id. (quoting Bright, 443 F.3d at 284).

The reasoning of Bright and Burella apply squarely to the facts before me.  Plaintiff's allegations that Defendant McClay and other police officers "actively suppressed" Defendant Booker's actions cannot be characterized as an affirmative act which rendered her more vulnerable to harm.  Rather, claims that Defendant McClay and others failed to investigate the PFA complaints are a failure to act.  Thus, Plaintiff's state-created danger claim against the City Defendants is dismissed.[9]

## 2.    Alleged Violations of the Equal Protection Clause

Plaintiff argues that her Fourteenth Amendment right to equal protection was violated in that she was treated differently based both on her status as a "female complainant" and as a "complainant[] in domestic matters involving former or current police officers."  (Resp. at 27.) She brings these equal protection claims against Defendant McClay and the City on a theory of Monell liability.

---

[9] In light of my conclusion that Plaintiff suffered no constitutional harm within the meaning of the state-created danger doctrine, I need not consider Plaintiff's argument that the City should be held liable on a theory of Monell liability for substantive due process violations.

### a.     Unequal Treatment Based on Gender

Hynson v. City of Chester, 864 F.2d 1026 (3d Cir. 1988), articulated the standard for equal protection claims based on the unequal treatment by the police of female domestic violence victims.  "In order to survive summary judgment, a plaintiff must proffer sufficient evidence that would allow a reasonable jury to infer that it is the policy or custom of the police to provide less protection to victims of domestic violence than to other victims of violence, that discrimination against women was a motivating factor, and that the plaintiff was injured by the policy or custom." [10]  Id. at 1031.

Here, Plaintiff has adduced no evidence to support a claim that she was treated differently on the basis of her gender.  In her second amended complaint, Plaintiff does not even allege that the police department in general or Defendant McClay in particular were providing her with less protection on the basis of her gender.  While she put forth this argument in her response to the City Defendants' motion for summary judgment, Plaintiff does not cite to her deposition testimony or any other part of the record to support this assertion. [11]  My review of the record confirms that there is no evidence from which a jury could conclude that Plaintiff was treated differently by the police on the basis of her gender.  This claim is dismissed.

---

[10] Hynson, like this case, involved a female plaintiff who had made equal protection claims against both the municipality and the individual officers who were involved in investigating (or failing to investigate) her allegations of domestic abuse. This standard for equal protection claims based on the unequal treatment of female domestic violence victims was however articulated in the context of whether the individual officers were entitled to qualified immunity for having carried out the policy of the municipality, and did not address the actions of the police officers which may have been independent of that policy.  Id. at 1031-32.  Accordingly, the Hynson requirement of there being a policy or custom of the police to provide less protection to female domestic violence victims (which echoes Monell) would not be applicable to Plaintiff's equal protection claim against Defendant McClay.  Nevertheless, in light of Plaintiff's failure to adduce evidence that she was treated differently on the basis of her gender – either as result of a City custom or Defendant McClay's independent actions – I need not dwell on this distinction.

[11] It appears from the record that Plaintiff did not depose Defendant McClay or any of the other police officers involved in the events which gave rise to this litigation.

### b.    Unequal Treatment Based on Plaintiff Having Made a Complaint Against a Former Police Officer

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  It is well-established that this is a directive which "guarantees similar treatment of similarly situated persons."  Plyler v. Doe, 457 U.S. 202, 248 (1982) (Burger, C.J.) (dissenting).   Here, Plaintiff alleges membership in a class of "complainants in domestic matters involving former or current police officers," and contends that she was treated differently than those individuals whose complaints did not involve former or current police officers.  (Resp. at 27.)  In order to prevail on a "§ 1983 claim for a denial of equal protection, [a plaintiff] must prove the existence of purposeful discrimination."  Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. Of Educ., 587 F.3d 176, 196 (3d Cir. 2009) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990)); see also Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) ("Our cases have recognized successful equal protection claims . . . where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.")  Plaintiff brings this denial of equal protection claim against Defendant McClay and the City on a Monell theory of liability.

### i.    Defendant McClay

Plaintiff alleges that Defendant McClay refused to take or follow up on complaints she made on May 20, 2009 and in the month of July 2012.  (Second Am. Compl. ¶¶ 29, 60-67; Swain Dep. at 49-51, 60-70.)  In my April 24, 2013 Order, I found that Plaintiff's allegations as stated in her first amended complaint against Defendant McClay regarding the May 2009 incident were untimely.  See doc. no. 13 (finding that all claims which accrued before September 2009 were time-barred given that § 1983 actions are subject to a two-year statute of limitations

and Plaintiff filed her complaint in September 2011).   I also considered whether Plaintiff's claims against Defendant McClay fit within the "continuing violation" exception to the statute of limitations, which requires a plaintiff to show that "(1) the 'last act evidencing the continuing practice falls within the limitations period;' and (2) the timely act is part of an 'ongoing practice or pattern' of prohibited conduct by the defendant."   (Id.) (quoting Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir. 1997).   The amended complaint, having been filed in 2011, well before the July 2012 incident, did not allege any act to have occurred within the limitations period.   As such, I found that Plaintiff's claim with respect to Defendant McClay did not meet the first Rush element, and I dismissed Plaintiff's claim against Defendant McClay on that basis.   (Id.)

In this second amended complaint, Plaintiff's allegation that Defendant McClay failed to investigate her July 2012 complaint certainly falls within the relevant limitations period.   I will consider this timely allegation here.   Pursuant to the second Rush element, I would be permitted to consider the May 20, 2009 incident so long as it fits within an "ongoing practice or pattern" of prohibited conduct.   Id. at 481.   It does not.   Plantiff's allegations against Defendant McClay concern two instances of isolated conduct which occurred over three years apart.   Indeed, in her deposition testimony, Plaintiff did not allege to have had "any interaction [with Defendant McClay] between 2009 and 2012."   (Swain Dep. 67.)   Accordingly, I will consider Plaintiff's allegations only as they relate to Defendant McClay's conduct in July 2012.

Plaintiff's interaction with Defendant McClay in July 2012 stems from her having filed a complaint with the police department in May 2012 that Defendant Booker violated the PFA order.   In her second amended complaint, Plaintiff states that on May 27, 2012, she was informed by her neighbor that Defendant Booker went to the neighbor's house and told the neighbor "that

if Plaintiff did not drop [this federal lawsuit] he would have Plaintiff locked up again and that he has the connections because of his friends on the force."  On May 29, 2012, Plaintiff went to the police station to give a statement regarding her complaint.  Then, on July 9, 2012, Plaintiff called the police to follow-up on her complaint.  She asked to speak to Captain Singletary[12], but was told that he was on vacation, and that Defendant McClay would be the one who would speak with her and be assigned to the case.  (Second Am. Compl. ¶¶ 53-59.)

Defendant McClay spoke with Plaintiff over the phone several times throughout the course of that day.  Defendant McClay allegedly told Plaintiff that she "was lying about [her] statement and Kevin Booker wasn't going to be arrested."  Defendant McClay also requested information concerning this federal lawsuit (he had already been named as a defendant), and told her that if she did not supply that information "he would close the investigation."  Two weeks later, on July 24, 2012, Plaintiff called the police station and asked to speak with Captain Singletary, who was unavailable at the time.  Defendant McClay returned her call, and allegedly told her that "the investigation was over."  (Id. ¶¶ 60-63, 67.)

These factual allegations do not support Plaintiff's equal protection claim against Defendant McClay.  Throughout these conversations, Defendant McClay made no statement that could be inferred to mean that he refused to take or investigate Plaintiff's complaints on the basis that she was making a complaint against a former police officer.  Aside from these factual allegations, Plaintiff has pointed to no deposition testimony or other evidence to support her allegation against Defendant McClay.  This claim is dismissed.

---

[12] Plaintiff does not explicitly state what role Captain Singletary played in investigating this complaint.  From the context of Plaintiff's allegations, it appears that Captain Singletary was the officer who first took Plaintiff's statement.

ii.   <u>Monell</u> **Claim Against the City**

A municipality may be held liable for its employee's violation of a citizen's constitutional rights under section 1983, although not on a *respondeat superior* theory of liability.  <u>Monell v. Dept. of Soc. Servs. of City of New York</u>, 436 U.S. 658, 690-92 (1978).  To prevail on a <u>Monell</u> claim, a plaintiff must show a policy[13] or custom[14] created by a policymaker that caused the alleged constitutional violation.  <u>Natale v. Camden Cnty. Corr. Facility</u>, 318 F.3d 575, 583-84 (3d Cir. 2003) (citing <u>Bd. of the Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown</u>, 520 U.S. 397, 404 (1997)).  To establish causation, "there must be an affirmative link between the policy [or custom] and the particular constitutional violation alleged."  <u>City of Okl. City v. Tuttle</u>, 471 U.S. 808, 823 (1985).

Here, Plaintiff "asserts that that the City of Philadelphia had a custom of engaging in Fourteenth Amendment violations in regard to the investigative procedure utilized by its police officers."  She contends that "adherence to investigatory protocol [concerning violations of the PFA orders] was lacking and that several officials assigned to her case, including defendant McClay, either conducted pretextual investigations that concealed defendant Booker's wrongdoing or as in the case with defendant McClay, failed to investigate at all."  (Resp. at 28.)  Having concluded that Defendant McClay did not violate Plaintiff's constitutional right to equal

---

[13] A "[p]olicy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict."  <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481 (1986)).

[14] "A custom is an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law.'"  <u>Natale v. Camden Cnty. Corr. Facility</u>, 318 F.3d 575, 584 (3d Cir. 2003) (quoting <u>Bd. of the Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown</u>, 520 U.S. 397, 417 (1997)).

protection, I need not consider Plaintiff's <u>Monell</u> claim as it relates to his actions.[15]   I will

however consider her <u>Monell</u> claim as it relates to the "several officials assigned to her case," as

I have not examined the actions of those individuals as they were not named as Defendants in the

second amended complaint.

> Plaintiff presents a litany of allegations against these other officials:
>
> On May 11, 2009, <u>Detective Wolkiewicz</u> refused to provide her with status of the investigation into her complaints against Defendant Booker;
>
> On June 5, 2009, <u>Officer Hetherington</u> told Plaintiff that nothing would be done about her complaints against Defendant Booker since Defendant Booker's uncle "owns this police district;"
>
> On June 28, 2009, <u>Officer Rollins</u> told Plaintiff that "she was reluctant to accept a complaint" that Defendant Booker had violated the PFA Order on June 20, 2009 "because it was 7 days after the incident;"
>
> <u>Internal Affairs</u> failed to investigate her September 3, 2009 complaint that police officers were refusing to investigate her complaints because of Defendant Booker's "former status as a police officer;"
>
> On October 16, 2009 an <u>unnamed Sergeant</u> refused to take Plaintiff's complaint after he asked whether Defendant Booker "was related to another high ranking Police supervisor Sid Booker;" [and]
>
> On June 30, 2010, an <u>unnamed police officer</u> came to Plaintiff's home and asked her questions about Kevin Booker, and made Plaintiff feel "afraid, threaten[ed] and intimidated."

(Second Am. Compl. ¶¶ 28, 32, 34, 37, 38) (emphasis added.)  Even viewed in a light favorable

to Plaintiff, these allegations would not allow a reasonable jury to conclude that Plaintiff was

---

[15]  Although the allegations against Defendant McClay concerning a 2009 incident were dismissed as time-barred, these allegations would still be insufficient to survive a motion for summary judgment.  Plaintiff alleges that, on May 20, 2009, Defendant McClay refused to take another complaint or follow-up on two complaints that she had made earlier that month alleging that Defendant Booker violated the PFA order.  (Second Am. Compl. ¶ 29.)   However, the record shows that, on June 8, 2009, Defendant McClay approved an investigation report which was prepared by Detective Shaina Brown, and that Defendant Booker was subsequently arrested on August 3, 2009 for violating the PFA order.  (Attached to Def.'s Br. at Exh. 5, 7.)  These facts would not allow a reasonable jury to conclude that Plaintiff's constitutional right to equal protection was violated.

treated differently based on her status as a complainant in a domestic matter involving a former police officer.  These allegations are merely conclusory, and are unsupported by any evidence of how similarly situated individuals are treated.  If anything, the statements which Plaintiff alleges these various police officers to have made point to unequal treatment based on Defendant Booker's relationship to a high ranking police officer, not on Defendant Booker's status as a former police officer.  Absent evidence of an underlying violation of Plaintiff's constitutional right to equal protection, Plaintiff's <u>Monell</u> claim against the City is dismissed.

### C.    Plaintiff's § 1985 Civil Conspiracy Claim

In her second amended complaint, Plaintiff asserts a civil conspiracy claim against Defendants McClay and Booker under 42 U.S.C. § 1985.  She claims that they "knowingly and willfully conspired to conceal and cover up and thwart the investigation regarding domestic abuse and the violation of the PFA orders against Defendant Booker."  She argues that "[t]he actions of Defendants, acting under the color of state law, deprived Plaintiff of her rights, privileges and immunities under the laws and Constitution of the United States."  (Second Am. Compl. ¶¶ 88-90.)

"[I]n order to state a claim under section 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." [16] <u>Lake v. Arnold</u>, 112 F.3d 682, 685 (3d Cir.

---

[16] Although Plaintiff does not explicitly state under which subsection she is pursuing her § 1985 claim, subsection (3) is the subsection which speaks to civil conspiracy claims. 42 U.S.C. § 1985(3) states: "If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or

1997) (citing <u>Griffin v. Breckenridge</u>, 403 U.S. 88, 102-03 (1971)).  In his motion, Defendant McClay focuses on the first prong of the standard and argues that Plaintiff's § 1985 claim should be dismissed for failure to "state that defendant conspired with anyone."  (Br. at 18.)

In her response, Plaintiff does not address Defendant McClay's arguments with respect to the § 1985 claim.[17]  I am thus permitted to treat Defendant McClay's assertions with respect to the § 1985 claim as undisputed.  <u>See</u> Fed.R.Civ.P. 56(e)(2) ("If a party fails to . . . properly address another party's assertion of fact, the court may . . . consider the fact undisputed for purposes of the motion"); <u>see also</u> Local Rule of Civil Procedure 7.1(c) ("In the absence of timely response, the motion may be granted as uncontested").  Mindful however that Plaintiff is a <u>pro se</u> litigant, I will address her § 1985 claim on the merits.

Plaintiff has failed to allege that Defendant McClay had any contact with Defendant Booker, let alone conspired with him.  <u>See</u> <u>Lake</u>, 112 F.3d at 685 (stating that a conspiracy and an act in furtherance of the conspiracy are required elements of a § 1985 claim).  Further, in light of my finding that there is no evidence from which a jury could infer that Defendant McClay violated Plaintiff's right to due process or equal protection, it follows that a jury could not conclude that Defendant McClay was guided by an invidious discriminatory motive in depriving Plaintiff of her constitutional rights.  <u>See</u> <u>id.</u> (stating that class based discriminatory animus and resultant deprivation of a federal right are required elements of a § 1985 claim).  This claim fails as a matter of law and is dismissed.

---

deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

[17] Plaintiff states only that she "brings this action pursuant to 42 U.S.C. § 1983 for defendants' violation of her Fifth and Fourteenth Amendment rights," (Resp. at 3), and does not reference the § 1985 claim against Defendants McClay and Booker in any way.

D.    **Defendant Booker**

In her second amended complaint, Plaintiff brings a § 1983 claim against Defendant Booker for alleged violations of her right to equal protection and due process, as well as a § 1985 civil conspiracy claim for having allegedly conspired with Defendant McClay.  (Second Am. Compl. ¶¶ 78-92.)  Plaintiff's claims against Defendant Booker are thus intertwined with the allegations against the City Defendants.

Defendant Booker, appearing pro se, has not filed a motion for summary judgment. Nevertheless, given my conclusion that the City Defendants are entitled to judgment as a matter of law, I am doubtful that Plaintiff's claims against Defendant Booker could proceed to trial.  In addition to the deficiencies in Plaintiff's claims which I have noted throughout this opinion, I am also mindful of the fact that Defendant Booker was a former police officer when the events underlying this lawsuit occurred.  See doc. no. 31 at 9 (dismissing Plaintiff's § 1983 claims against Defendant Booker in her amended complaint because Plaintiff did not adequately allege that Defendant Booker engaged in state action).

Federal Rule of Civil Procedure 56 (f)(1) allows me to "grant summary judgment for a nonmovant" so long as the parties are "giv[en] notice and a reasonable time to respond."  I will invoke this authority here, giving Plaintiff a reasonable amount of time to show cause as to why her claims against Defendant Booker should not be dismissed.

IV.    **CONCLUSION**

Because the City Defendants have shown that they are entitled to judgment as a matter of law on all of Plaintiff's claims, the above-captioned action will be dismissed as to the City Defendants.  Plaintiff will be given the opportunity to show cause as to why the claims against Defendant Booker should not be dismissed.  An appropriate Order follows.